**Application of James W. MILLIGAN.**

**Patent Appeal No. 8314.**

United States Court of Customs and Patent Appeals.

June 18, 1970.

Rehearing Denied Oct. 8, 1970.

Louis Robertson (Darbo, Robertson & Vandenburgh) Arlington Heights, Ill., attorney of record, for appellant.

Joseph Schimmel, Washington, D. C., for the Commissioner of Patents; Joseph F. Nakamura, of counsel.

Before RICH, Acting Chief Judge, ALMOND, BALDWIN, and LANE, Judges, and FISHER, Chief Judge,

Eastern District of Texas, sitting by designation.

RICH, Acting Chief Judge.

This appeal is from the decision of the Patent Office Board of Appeals affirming the rejection of claims 1, 5, 6, 8, 9, and 12 of application serial No. 109,839, filed May 15, 1961, entitled "Permanent Magnets and Methods for Their Production." There is no allowed claim in this application but it is a continuation-in-part of application serial No. 767,560, filed Oct. 16, 1958, which has matured into Patent No. 3,114,582, dated Dec. 17, 1963, entitled "Magnetic Suspension." We affirm the board's decision.

### The Invention

Applicant is concerned with making molded permanent magnets from powdered magnetic material the particles of which are bonded with a synthetic resin of the thermosetting type. As the above patent shows, the magnets are made for such uses as parts of a magnetic suspension of rotating elements in watthour meters to produce a frictionless support. In such a suspension a hollow cylindrical stator magnet surrounds a cylindrical rotor magnet attached to a rotating shaft, the shaft being supported by magnetic attraction which balances the force of gravity. These molded magnets must be made with great dimensional accuracy and they must have dimensional stability under conditions of use including heated environments, as where the meters are installed in sunny places in hot climates. The patent states that powder molding of magnets is a known art and that there have been many proposals for suspending rotating parts magnetically.

The appealed claims are directed to compositions (claims 1 and 12) for making molded magnets and methods (claims 5, 6, 8, and 9) for making the magnets. Claim 1, the broadest composition claim, reads:

1. A cold-moldable heat curable composition for the production of precision parts comprising

(I) a thermosetting epoxy resin composition yielding a product having a high temperature of heat distortion after curing, and

(II) a sufficiently predominant proportion of finely divided magnetizable material remaining unfused at curing temperatures for said resin to maintain precise dimensions to which the composition is pressure-molded, while heat cured outside of the mold at a temperature causing the resin to pass through a liquid phase.

The matters with which we are concerned on this appeal appear primarily in part (II) of the claim. It will be noted that *such* proportion of magnetic particles to resin is used that a pressure-molded but *uncured* form maintains its precise dimensions while it is heat-cured *outside* the mold and that this is true even though the resin, in the course of being cured, passes through a liquid phase. The passing through a liquid phase appears to be necessary and desirable as it results in wetting of the magnetic particles by the resin before it sets to a solid state. It also appears to be an inherent property of the resins used to pass through a liquid phase during heat curing. The crucial matter, as appellant argues his case for patentability, is the proportion and it will be noted that in this claim it is stated functionally, i. e., such proportion as to produce the desired dimensional stability.

The point about curing the molded article *outside* of the mold is that, in a mass-production operation, this avoids having to wait for the cure to take place before removal of the articles from the mold. The articles formed in the mold by pressing can be removed therefrom immediately, thus making more economical use of the mold which is an expensive piece of equipment, considering that molding is said to be done with the aid of a press capable of producing a pressure of 40,000 p.s.i. The curing time

disclosed in the application is 30 minutes at 300°F. Cold molding with curing outside the mold also eliminates the heating and cooling of the mold.

Claim 5 is representative of the method claims, which vary from one another in scope:

5. The method of producing a molded member comprising the steps of pressure-molding in a mold, a composition including a thermosetting resin, liquid during an early state of heat curing, and yielding a product having a high temperature of heat distortion after curing and a sufficiently predominant proportion of a finely divided magnetizable material which will not melt at curing temperatures of the resin to cause the pressure-molded piece to maintain its precise dimensions when cured through the liquid stage after being removed from the mold, removing the piece from the mold before curing, and baking it outside of the mold at a temperature to cure it and at which the resin is in a liquid state during part of its curing period.

### The Rejection

Two decisions of the board are involved here. The first dealt with claims 1, 5, 6, and 8–11. Thereafter prosecution resulted in eight additional papers in the file and the substitution of claim 12 for claims 10 and 11. In the first decision, the following references were relied on:

| | | |
|---|---|---|
| Cass | 2,683,131 | July 6, 1954 |
| Kazenas | 2,936,287 | May 10, 1960 |
| British | 579,698 | Aug. 13, 1946 |
| British | 705,271 | Mar. 10, 1954 |

In the second decision, the following references were additionally relied on:

| | | |
|---|---|---|
| Wiles et al. | 2,681,901 | June 22, 1954 |
| Nagel | 3,028,251 | Apr. 3, 1962 |
| | | (filed Nov. 20, 1956) |

Debell et al., German Plastic Practice, 1946, pages 480 and 481
Lee et al., Epoxy Resins, 1957, pages 154–157.

---

In its second decision, the board summarized all outstanding rejections as follows:

Claims 1, 5, and 6 on British patent 705,271 in view of British patent 579,698 or Cass.

Claims 8 and 9 on British patent 705,271 in view of Cass.

Claim 1 "as substantially met by Cass or Kazenas."

Claim 12 on the art cited hereinabove and previously applied to claim 27 in Serial No. 130,206, considered together with Kazenas if necessary.[1]

### Opinion

Appellant's claims on appeal call either for a "thermosetting resin" broadly or an epoxy resin. He concedes that the resins disclosed and referred to in the claims are old in saying:

* * * appellant is willing that Milligan [who is appellant] be credited with something less than origination

1. Serial No. 130,206 was a joint application of Milligan and Greenlee, filed May 11, 1961, in which the board had rendered an opinion March 25, 1966, Appeal No. 348–85. At one time there was a double patenting rejection herein of claims 10 and 11 (now replaced by claim 12) on the ground that claims 27 and 34 of No. 130,-206 were directed to the same subject matter. The references relied on in the other appeal were Wiles, Cass, Nagel, Debell, and Lee, all listed above. The board's opinion in No. 130,206 is of record here and shows that all claims were rejected.

of the resin used, namely with selecting, with skilled help, this resin mixture, from among thousands, for best satisfying his special magnet molding needs.

Nothing of record supports the assumption of "thousands" of resins worthy of consideration. Furthermore, the references show that not only are the resins of the claims old, as is conceded, but that they have been used in the making of molded magnets by using them as binders with powdered magnetic or magnetizable materials.

British 579,698 discloses the resin. British 705,271 refers to it as disclosing a suitable resin for making molded magnets. Appellant's brief concedes both references disclose epoxy resins. The latter reference says it was previously known to make molded magnets from magnetic powder and resin binders, both thermoplastic and thermosetting, previously known resins in both categories having had certain disadvantages now found to be eliminated by using the new thermosetting epoxy resins. The concluding paragraph of the patent is of great significance here:

> The magnetic elements may be produced in the known manner by pressing in heated moulds, or they can be cast in such moulds. The binding agent is hardened either in the mould itself *or by thermal after-treatment of the pressed article taken from the mould.* [Emphasis ours.]

This patent also discloses that magnets thus made "retain their shape under heat" and have "greater mechanical strength."

Debell discloses the manufacture of precision magnets by compression molding a mixture of magnetic particles and a phenolic resin binder, the composition being 85% magnetic particles and 15% resin. It is stated that such magnets have only 85% of the magnetic intensity of Alnico, Alnico being the magnetic material itself. Thus, the intensity appears to be the same as the percentage of magnetic material in the molded product from which one would naturally deduce that the higher that percentage the higher the magnetic intensity.

Cass discloses appellant's epoxy resins, describes the properties of molded products containing various fillers, and includes this paragraph:

> Various magnets may be prepared by which magnetic materials, for instance, Alnico powder, may be mixed with the compositions of matter herein described and molded to give strong pieces which have been found to have breaking strengths of nearly 600 lbs. This is materially in excess of the breaking strength of similar pieces molded using phenolic resins or mixtures of other polymerizable materials and unsaturated alkyd resins as the binders.

Cass discloses that the epoxy resin passes through a liquid phase in curing, as British 579,698 does also.

Kazenas deals with magnetic particles coated with some of the same epoxy resins used by appellant and subjected to curing so as to pass through the A-, B-, and C-stages of which such resins are capable but we are not much impressed with the relevance of this reference. It does not disclose making molded objects in which the particles are bound together but rather with the adhering to *particles* of very small sizes (under 10 microns) of a visualizing coating of pigment or fluorescent material, the thus coated *particles* being used in magnetic flux systems of non-destructive inspection for locating flaws in structures of paramagnetic materials. Forming solid parts from the magnetic particles and resin is the last thing Kazenas wants to do. He wants small coated particles which can be suspended in a fluid medium to be flowed over the article to be tested so as to adhere to the surface where the flaw is. The board used Kazenas, as does the solicitor, principally for its disclosure of proportion of magnetic particles to resin. Kazenas says it should not be over 56 to 60 percent resin by volume, preferably is 25 to 35 percent, and that 6 to 10 percent is a "critical

minimum." Even so, this has no bearing on making molded articles with dimensional stability in the "green" or uncured state.

What then of the other references relied on and their bearing on patentability? The primary issue is obviousness of the claimed subject matter in view of the references. Appellant's principal argument is that he patentably distinguished therefrom in his recitations with respect to proportions which are such that the cold-molded formed product will retain its dimensions while being cured outside the mold. Appellant gives only one example of proportions and that is 6% resin by weight. Debell discloses 15% with a different resin. Appellant does not teach any limits to the proportions. He merely writes his claims functionally so as to require that the proportion be such that he will maintain precise dimensions during curing. He does not show that the prior art proportions would not do that.

British 705,271 clearly teaches the alternatives of curing in a heated mold or curing after forming, outside the mold. Appellant argues that in the latter situation the British patent indicates that the pressing is in a heated mold. The patent does not say so and it is evident to us that if the heating is to be done after molding, those ordinarily skilled in the art would not bother to heat the mold if it is not necessary. We think it would also be well within the skill of the art to use whatever proportions will give the desired dimensional stability to the uncured article. It is known that the epoxy resins go through a liquid phase in curing and that in itself would seem to indicate that the quantity of resin would have to be low enough not to affect dimensional stability. The board also pointed out, and we agree, that the desire to maximize the strength of the magnet would teach minimizing the percentage of binder resin, especially in view of Debell.

We have carefully considered all of appellant's arguments but for the above and other considerations we see no reason to disagree with the board's conclusions with respect to claims 1, 5, 6, 8, and 9. Claim 12 depends from claim 1 and adds thereto detailed limitations with respect to the nature of the resin component. The specific resin and its catalyst are shown in Nagel together with its asserted advantage of long shelf life or retention of its physical form during prolonged storage and its ability to form a thermoset coating. To put the question of patentability of claim 12 in appellant's own terms, we do not think that the "selecting, with skilled help, [of] this resin mixture" from the many available renders the composition "as a whole" unobvious within the meaning of section 103. The desired properties were known and the art discloses the resin combination selected to have those properties.

Our decision as to all claims under section 103 makes it unnecessary to discuss the rejection of claim 1 under section 102, assuming such a rejection to have been made.

The decision of the board is affirmed.

Affirmed.